And we'll hear from you, Mr. Tobosky, representing PLS. Thank you, Your Honor, and may it please the Court. In 2009, Derrick and PLS entered into a contract where they stated right up front that they were going to work together in good faith as joint venture partners to market and develop E&P database products. Later in that same contract, they acknowledged that what was going to be developed were, quote, joint E&P database products, and later referred to those products in another paragraph as JV products. Despite this clear language in a binding signed contract, the District Court nevertheless found that no partnership existed and that PLS had no interest in the database that those parties worked together to develop, either as a partner or otherwise. The question then becomes, how did the District Court, given the language of this contract, reach this erroneous result? And that erroneous result occurred because of errors of law the District Court made interpreting the Texas Partnership Statute. The first most significant error has to do with the control factor. Your Honor, are you resting solely on the written document of the Memorandum of Understanding? Not at all, Your Honor. I think it's a very important piece of evidence, and it certainly goes to it is evidence of multiple of the factors, but I'm not relying solely on that, Your Honor. What are you relying on it for? Pardon? For what point are you relying on it in terms of establishing a partnership? So first it goes to the factor of expression of intent to be partners. I am also using it to show contribution of property to the business because that contract sets forth what each party is going to provide and contribute to the partnership. I further rely on it to show the right to control or to participate in control of the business. I further rely on the MOU to describe what the business is. Notably, the statute repeatedly refers to control of the business, sharing of profits of the business. So one of the threshold questions, of course, is what is the business? The contract tells us that it is to develop and market E&P database products, which is exactly the business these parties engaged in for several years until they got crosswords with one another. So do you actually have three ways that you could prevail, one directly on the partnership, one under the MOU language, et cetera, for ownership of half the database, and then one as joint creator of the database that's a separate stand-alone claim, or does that one meld into the MOU claim? To the extent copyright law is even applicable here, and we're not sure that it is, it melds into that second point. So there's two ways. You either win on the partnership or you win otherwise under the agreement. I think that's right. If the court determines there was an error in the partnership analysis, as we set forth in the brief, the district court's analysis of the ownership issue is really mixed in with its partnership analysis. So if the court determines that the partnership issue needs to be remanded, that issue sort of infects everything else in the case. Now, the court . . . But you don't need a partnership to win. That's correct. I don't need a partnership to win. If the court determines that the district court erred on the partnership issue, it would put the ownership issue in place, certainly, but I don't need it. That's your best shot, and so that's what you're going to start with. I think I have a good shot on both of them.  Go ahead. But I think the most significant and clear error is on the control factor. Keep in mind that there's five factors that the statute and the Texas Supreme Court and Ingram say go into the partnership inquiry. The district court found two of the five factors and said, I find two of the five factors, but I'm not going to say that's not enough. The control factor, which the legislative comments to the statute note is one of the most important factors. It is, you know . . . Well, there's five factors out there. It's one of the top factors. She just got the law wrong, and the district court certainly quoted the statute and cited Ingram, and it noted in Ingram that the right to control is the right to make executive decisions, and she found, as a factual matter, that PLS did have the right to make executive decisions regarding the sales and marketing of the database, and it set the pricing, it decided who to sell to, and it also noted that PLS not only had control over those issues, it had input into the product development issues. Okay, so . . . But that's not the whole ball of wax, either one of those. I mean, there are other issues involved in running a business besides how we're going to sell and market. It is true your client, under the arrangements here, had to do with sales and marketing. That was the sphere that it was operating in, but that doesn't make a partnership. This is a deal, a venture, a joint venture, but the question whether you really established as a matter of law on this record that there was actually a partnership under Texas law is very different from a joint venture. I understand that, and to be clear, in our brief, we make the point that because there were errors regarding legal errors on some of the factors, a remand is necessary for the district court on remand to kind of rebalance once under the right law, and I would love for this court to just say, as a matter of law, there's a partnership here, but I think on this record, if the court determines that there are errors of law in the district court's conclusions of law, that the appropriate remedy would be a remand for further proceedings to let that court go forward and decide these factual issues based on the correct law. And the issue here is Ingram says that there are four different examples of executive decision making. One of those is the right to control business operations. The district court found the right to control business operations, found the right to control sales and marketing, but then, for whatever reason, said there's no control here at all because the district court erroneously wrote a new element into the statute, that to be a partnership, each partner had to be able to control the whole business, and Ingram doesn't say that, the statute doesn't say that, and nothing else in Texas law says that. In fact, the decision by two partners at the outset to divide responsibility and say, you're going to handle this and I'm going to handle that, that itself is a paradigmatic example of control. We see that in the Moody case and the Milberg factors case cited in our briefing. So, first, just that alone establishes control. And here I'm not having to argue the district court got the fact findings wrong, the court got the law wrong and thus gave no weight to the facts it found. And because it, essentially, it found facts and then answered the wrong question. Had the court answered the right question and taken those fact findings on control, we'd have a third factor and then it's up for the fact finder to say, okay, now on these facts that I found, how do I weigh these? And that's where the harm is and that's where the error is on the control issue. The other issue with control is at certain points the district court said, well, just having input isn't control. If all we could do, if we had the right to control nothing, and all we could say is, hey, I got an idea, that might be right. But what the Texas courts in post-Ingraham said, particularly in the Malone case, said is as long as you can control some parts of the business, input into others is further evidence of control. And here the district court found as a factual matter that there was input in the parts of the business that PLS didn't control itself, but then said input's not control. But the overall problem on control really gets to the fact that she just imposed a much higher standard requiring each partner to be able to control everything and that is not Texas law. And that legal error infected the fact findings and caused the court to fail to give any credence to it. And I would note that when the court thought a factor was there but weak, the court said it. For example, on the contribution factor it said, I find that the parties do contribute property, but I find the factor to a limited extent. Now, I disagree with that, but the important point is that when the court found evidence and got some evidence, it said, you know, I see some evidence. Here the court made all the fact findings necessary under Ingram in the statute to establish control, but then said no control at all. And that's because of the legal error. The next issue, I think, of legal error in the partnership analysis has to do with profit sharing. And the district court's error here was she basically imposed a requirement that doesn't exist in law that to be found to be profit sharing, you have to basically do like the old order of operations like you learned in my class as a kid, where you have to do this, then this, then this to calculate profits. And Ingram doesn't say that. Ingram does say that profits is the excess of revenues over expenditures. No doubt about that. And what the parties did here was they said, we're going to split the revenues this way and we're going to split the costs this way. So each side got some profit. Now, depending on the cost in a given month and the revenues in a given month, it may not be equal sharing, but the statute doesn't require that, perhaps. But nevertheless, the district court erred as a matter of law in imposing that requirement. What Ingram said . . . The point is that Ingram is really broad and flexible and the whole idea is broad and flexible and it's just supposed to eliminate accidental partnership and this is very stringent and tight. Is that really the problem with this case? I think that is certainly . . . I apologize, Your Honor. No, go ahead. I think that certainly is a problem with this case. Ingram does set a lot of broad principles and what I think the district court did for whatever reason is interpret it very strictly and focused and in some ways misunderstood what Ingram was saying. For example, in Ingram, the court said, we don't find profit sharing here because there was no allocation of costs. It just said, I'm going to get a third of the revenue, the second partner is going to get a third of the revenue, and the other third of the revenue will go to costs. And what the court's concern there was, was that there may not be enough to cover the costs and it doesn't deal with it. Here, all the costs were covered by one partner or the other and in some cases, even though there was a division among them, each partner wound up covering each other's costs. There were times where PLS was covering Derek's cost-related product development, product management. There were times that Mr. Deodar testified that he incurred sales and marketing costs on his side of the ledger. So while there was an attempt at a formal division, in practice, there was costs going around on both sides. But the . . . No partnership returns, huh? There actually . . . this isn't in the trial record, but it's in the record in further proceedings in the district court. There was a tax return filed later in 2013. I don't believe it's part of the trial record, however. But other than that, I believe that is correct. I will double-check on that. But what we see is, to your point, Judge Elrod, the district court far too narrowly read the profit-sharing. When you see the examples where profit-sharing doesn't occur, it's to avoid what you call the accidental partnership, where somebody's entitled to a cut of the revenues by a quarter of the profits, but it's basically free-riding. It's just they don't have any skin in the game other than, you know, labor or work. And that's the Schlumberger v. Swanson case, for example. And there, the court said, that doesn't make you a partner just getting a cut of the action. You've got to have skin in the game. Here, both parties did, and they had skin in the game in their combined business. And let's be clear, the district court recognized that they had a business together. There's not a question... That's right. I mean, they had a joint venture is what they had. Yes. The question is, did it add up to a partnership under Texas law? I agree, and we believe it did. But the big issue here on appeal is that in the five-factor totality of the circumstances test, the district court got the law wrong on two of the five factors that it did not find existed. And that alone requires a remand for further proceedings. If I could, I would like to turn briefly to the second issue about, even if there's no partnership, does PLS have an ownership interest in the database that it and Derek created together? The answer to that question is yes. And here, again, I think the MOU answers this question on its own. The MOU says that they're going to develop a database together. Each party is going to contribute or provide its existing database products. Derek would then put it all together, as it saw fit, to create a new product. Now, there's a lot of evidence in fighting back and forth about how much PLS's contribution was worth, how much Derek's contribution was worth. But the court doesn't need to get into all those issues. It only needs to look at the contract. And I would point the court to page 3915 of the record, which is the second page of the MOU. And in numbered paragraph 2 on that page, it refers to, it says, PLS and Derek jointly agree. That is a number of things. And in paragraph 2, it says how they're going to share revenues from, quote, PLS Inc.'s joint E&P database sales. It specifically refers right there to the joint E&P database. If the idea was that only Derek was going to own it, it wouldn't refer to it as the joint E&P database. It would say Derek's database. Similarly, in the exit mechanism, which is the next main paragraph down, where the court is saying... I'm sorry, where the parties are saying, what happens if Derek just walks out on this before its term is up? What happens? It says, Derek, you maintain the database on your systems. You've got to give a copy of it over to PLS. And it refers to the M&A or other JV product. It has to be the software for, quote, M&A or other JV products. That language right there acknowledges that the M&A database, also known as the E&P database, is a joint JV product. They call it that right there in the contract. So I think the contract alone answers that question. Isn't that a much easier route for you than all this partnership and control? I don't understand the order of the case. You know, I think, to be fair, I kind of took it as . . . I took it on as the district court kind of ruled on it, focusing on the partnership issue, and then this . . . I agree. I mean, I think that the contract . . . Now, if you believe that these documents and these writings and admissions show that they equally 50-50 own the database jointly created pursuant to the MOU, then none of the rest of that matters. Nothing else matters, does it? With respect to ownership, I would agree that the partnership inquiry doesn't matter. There are some issues regarding the partnership. You know, we're here on 54B certification. There are some other fiduciary duty claims and some other claims that partnership might be relevant to. But at the end of the day, you're right. The ownership issue is the big issue for my client, and if the court wants to say that, my client's happy. Unless the court has further questions, I will sit down for now. Okay. Thank you very much, Mr. Dabowski. And Mr. Cook, we'll hear from you. Thank you. Good morning. May it please the Court. My name is Brendan Cook, and I represent Derrick Petroleum Services. In the limited time I have this morning, I will try to deal with the partnership issue and the ownership issue, but I feel compelled to make a few preliminary remarks at this point. We had an experienced trial judge who had a four-day bench trial, heard seven live witnesses, over 200 exhibits, took a month and a half then to craft a 35-page opinion. As this Court knows, there must be clear error to reverse this trial court's decision. There must be a definite and firm conviction that a mistake was made. I submit to this Court that Judge Rosenthal did not make a mistake in this case. Counsel started, consistent with their appellate brief, suggesting that Judge Rosenthal got the law wrong, that she erred as a matter of law. A couple of observations in that regard. There's really no dispute in this case as to what that law is. There's no dispute that Ingram v. Deere controls. And I want to underscore for this Court that the trial counsel at the time told Judge Rosenthal that Ingram is the best case for both sides. The last review by the Texas Supreme Court of Partnership Law, which goes through all of the factors, that's record on appeal at 2230. So there should be no doubt in this Court's mind what law applies. There's been a bit of a shell game in the briefing in terms of the interplay between the statutes, the Texas Business Organizations Code, Ingram, and what the Court did in that regard. The second observation I'd like to make, of course, is that, as is typically the case in a bench trial, the Court is the sole orbiter of the credibility of the witnesses. And it bears noting that at least three times in the Court's opinion on critical issues relating to the sharing of profits, expenses, and contributions to the database, it was determined that the PLS testimony on those issues was not credible, that it was inconsistent with documents, or it just didn't follow consistent with other testimony in the case. And I'd invite the Court to look at the record on appeal at 834, 835, and 838, if you will. So, having said that, I want to make sure that I touch on a couple of key base points. There were questions that were lodged in Mr. Tobolsky's argument regarding the intent to be partners. The only intent... There was some discussion about the intent deriving from the MOU. The MOU, and the Court can look at that. It's Plaintiffs' Exhibit 1. It is, according to Judge Rosenthal, ambiguous on that subject. But more importantly, and I'll come back to this, I hope, in a few minutes, the testimony from PLS witnesses conceded that there was no transfer of any interest into the ownership of the database at that time. But on the subject of intent, there's precious little evidence of intent expressed by either side to be partners. That which is in the MOU was determined to be ambiguous, and the Court stated that she gave those statements in the MOU and other statements that were admittedly made, either internally, between the individuals themselves, Mr. Yashadib Deodar, the president of DEREC, Mr. Ronald Wise, the president and owner of PLS. The Court gave those statements limited weight since the ultimate expression of intent was found in the MOU, that intent to formalize the relationship in the context of a partnership agreement. How is it ambiguous? It's ambiguous because... How is what ambiguous, Your Honor? The MOU on the point. The MOU is ambiguous in terms of the intent to be partners because it's merely an aspirational expression of intent, and it contemplates... It's a preliminary document. It says we're going to form a partnership agreement. We're not talking about as to the partnership. Maybe you were only talking about as to the partnership. I'm talking about the ownership interest in the database. The ownership interest because all... It doesn't say anything about the ownership interest. That's the bottom line, as Judge Rosenthal concluded, that it says nothing with respect to ownership interest, and the testimony of Mr. Wise and Mr. Litsky is basically consistent in that regard as well. It says nothing about it? Is that your position? That is my position, Your Honor, and I will cite to the record Mr. Wise of PLS said that Derek should have known to put ownership in this 3-page document, but he didn't. That's Plaintiffs' Exhibit 69 and Record on Appeal at 4862. Mr. Litsky, who drafted this document, who's in this courtroom today, Mr. Litsky said that ownership is not clear in the MOU, and I refer to Plaintiffs' Exhibit 68 and the Record on Appeal at 4860. The MOU does not have the word ownership in it, Record on Appeal at 2461 to 62. Each of those individuals admitted at trial that the ownership argument that this Court is confronted with here today does not derive from the MOU, but was contrived by counsel for purposes of argument at trial. That's Record on Appeal at 2461 and 62. And last but not least, the Court also concluded that the testimony of PLS witnesses on that subject was not credible, basically. So, long and short, there's simply nothing to be said or nothing to follow from the MOU as far as the ownership. Let me be sure. At the beginning of all this, Derek owned the database. Yes, ma'am. And PLS added information, and so, I gather, did Derek as the thing rolled along. I mean, people put more information into it, but there's no provision in it that says, here's what we started with in terms of ownership and here's what we're going to end with in terms of ownership. Ownership of the database is simply not addressed. Is that what you're saying? Yes, Your Honor. Is that correct? There were a few points that you made in your question. Point one, simply put, the MOU does not expressly address ownership, and I touched on that. Point two, you referenced alleged contributions made by PLS to the database. I should underscore for this Court, as we were preparing this case and we looked at how we were going to evaluate this information, we went out and retained a very well-respected forensic expert in this field, an individual named Nancy Miracle. Ms. Miracle testified, and her testimony was essentially uncontroverted. You can scour the record high and low and you won't find anything to contest the testimony of Ms. Miracle, including cross-examination of key witnesses of PLS. And I think the important point there is that Ms. Miracle made a few observations or conclusions. One, and I don't think this point is in dispute, that the database as it was originated and created by Derrick in 2006 was essentially the same database in 2009 and 2014. She took five separate snapshots of that database and confirmed that although the database evolved and new information was put into it, it ultimately contained the same fingerprints, or thumbprints, if you will, and I invite the Court to reference her testimony in the record at page 2559. So are you saying that PLS didn't substantially contribute its own data design and expertise regarding how to interpret and analyze the data to the... Yes, I am, Your Honor. I think the record is overwhelming in that regard. And to prove that, there are some facts and figures, if you will, that I might suggest to the Court. Ms. Miracle did a detailed review and found specifically that .02% of 16,001 M&A records came from the PLS 2009 database, but less than one-half of 1%. Ms. Miracle reviewed almost 3,000 e-mails from PLS to Derrick, and she conceded that of that contribution, only 1.7% of the data that was embraced and contained in the M&A database actually came from or originated from PLS. Indeed, there were many suggestions on many occasions that were made by PLS, but I should underscore and note they were also made by customers of Derrick. They were made by Total, they were made by Shell, they were made by Statoil, and the record reflects this. And if you were indulged for the moment the notion that merely because PLS made a suggestion to Derrick and that suggestion was incorporated, then by implication the Shells, the Totals, and all those other companies ostensibly have an ownership interest as well. But aren't there some documents that reflect that they were going to have to try to buy PLS's interest out, and nobody was ever talking about buying Shell's interest or Totals' interest out? There's one very limited document, and frankly, Your Honors, that document followed from a mediation that took place in New York City when it became apparent that there was going to be a business divorce in this case. It was a settlement discussion. And Derrick's offer was not to buy out the interest in its database that it created, but there were subscription agreements that had been entered into with numerous customers that were generating a cash flow, a cash flow that I think the record shows at one point in time, I can't remember the precise year, exceeded $2 million then. So all Derrick was doing... What about buying PLS's interest in the database? That's the title of the document. Well, then that's a misnomer, Your Honor, because the simple fact of... Neo Dar said, I mean, entitled the thing Buying PLS's Interest in the Database. Right. Well, at that point in time, PLS was asserting an interest in the database. And if you look at the record, there are a myriad number of documents in which not only does PLS question whether it has any interest in the database and will lament the fact that the record is unclear in that regard and then make admissions that they don't and Derrick challenges that as well. At this point in time, there was a crossfire between the parties, and they were just trying to settle an issue which at that point was in dispute. Well, before there was a dispute, there were these subscription agreements, right? There were... Yes, Your Honor. And the subscription agreements also described the M&A database as jointly created and assigned copyrights to both parties over and over again. Right. Well, a couple... Why would that be... Wouldn't that be indicative of joint ownership? No, Your Honor, it wouldn't for two reasons. First of all, that is a PLS document unilaterally created by PLS, and it was not approved by Derrick. It's a self-serving unilateral declaration. That's point one. Second point, the characterizations that the parties themselves bring to bear regarding their relationship is not dispositive. And I'll cite some examples. I would invite... I'm sorry, is it a contract term or is it a unilateral declaration? I'm sorry, you're going kind of fast. Can you help me? Sure. I thought it was a contract term. The subscription agreements were agreements that Derrick had nothing to do with. Those were documents, and this gets back into the separateness of the business and what the Court observed to be these separate spheres that were controlled by each side. The MOU basically had PLS doing the marketing. What was characterized as the front end of the business, and the back end of the business was the technical aspect, the creation, maintenance, and operation of the database, if you will. On the front end were the subscription agreements. Derrick is a small company, three or four employees, located 10,000 miles away in India. They had nothing to do with these subscription agreements. But they signed it. Excuse me? The person signed the agreements. I'm not sure if that's correct. There may be some... Deodar. How do you say that? I'm sorry. Mr. Deodar. Mr. Deodar signed the subscription agreements. So I don't understand how they have nothing to do with them if they're signed by him. Am I wrong on the facts? They're using his database. They're using his database. They say it's jointly owned, and he's signing it. Well, he's wrong. It's not jointly owned. I mean, that's the bottom line. But he's the person who has authority on behalf of Derrick. I understand that. He's an Indian citizen. He is not a lawyer, and his characterization or understanding of whether the parties are partners or not or who owns what assets are not legally dispositive. I say that with all due respect, Your Honor. But there's some evidence. There's evidence that the court considered and determined and her weight to be accorded those five factors to be analyzed under England. But you don't need those five factors if individually... If you're not going for partnership, you're going for whether there is a joint ownership of the database apart from a partnership. It's a totality of circumstances, tasks, the ownership interest. At the end of the day, you look at the three Cs, creation, control, and contribution. There's no dispute that the creation of the database was undertaken by Derrick. As far as control is concerned, and that is a very important factor, and I would allude to the... There are at least four or five instances in which the court observed, and I quote, Derrick retained and maintained control over the content structure and presentation of the database. That's at Record 832. The evidence shows that Derrick exercised his contractual prerogative of controlling the database's content and format. And it goes on in that same vein. And because Derrick was the sole party in possession and control of the database, it is presumed to be the owner, and I would cite reference to the Rollins case, which we cite in our brief. Let me be sure I understand something. These subscription agreements, they're for the customers, right? Yes, Your Honor. They sign up. They would have to be signed by someone from Derrick because Derrick's got the database at least at the outset, so he'd have to sign, wouldn't he? Well, I'm not sure. I don't know how much you make of the fact that he signed it because it is a joint operation, and he's one of the joint people who's working on the database. And I know the other side also put in information into the database, but certainly if you're a customer, you're going to want to be sure that you've got Derrick on the line here. Am I right? I think partially, Your Honor. I think we're looking for consistency and absoluteness where there probably isn't any. We're looking at a five-year continuum, over 200 subscription agreements, and I can't sit here or stand here today before the Court and say every one was treated in a consistent manner. I suspect if we were to go through all 200 of them, Derrick probably signed some. They didn't sign others. The way the independent aspects of the business operated, it evolved over that period of time as the revenue generated from the business increased, if you will. I can only say that Mr. Wise, the president of PLS, was adamant in his testimony that these subscription agreements were ours, stay out of our business. We control the front end, you control the back end. And his testimony, which the Court relied upon, was expressed and on point when he said we're liable for the subscription agreements, these are our business, they're not yours, we're on the hook. So I hesitate to say that any signature by Mr. Diodar might be considered pro forma in nature, but these things would be sent over to him on India and he would sign them. I would submit to the Court that does not, merely because of the language that Mr. Litsky or Mr. Wise may have drafted, elevate PLS to the position of an owner in the database, given the fact that it had nothing to do with the creation, given the fact that it had nothing to do with the control, and there was certainly at the end of the day, as the Court said, no transfer of ownership, and that is the key. Why did they hold the copyright jointly? I'm sorry, Your Honor? Why did they hold the copyright jointly? Why did they hold the copyright? I'm not sure, can you repeat it one more time? My question is, if they don't have any interest in it, in the database itself, why are the parties holding the copyright in the database jointly? I'm not sure they are. And I would say this, Your Honor, if it is, it's not because of anything Mr. Diodar did. There has been, and the Court addressed this in her memorandum opinion, that the copyright issue was only raised, and you have to have two elements there. You have to have a transfer of ownership and an intent to transfer ownership, and the Court concluded that, one, there was no transfer, and two, no intent to effect transfer. And I'll quote the Court on this at record on appeal at page 850, that the Court said, the MOU language is consistent with Diodar's credible testimony that the parties did not intend in the MOU to transfer any ownership interest in the database. The Court found no evidence of intent to transfer. The Court found that the MOU was silent on the ownership interest. And again, I go back and revisit what PLS said, because PLS knew this. They criticized Diodar and said he should have put it in, but he didn't. Mr. Litsky says ownership's not clear. It doesn't have the ownership interest in it, basically. And the bottom line is, and there is a case that sort of bears on this, it's the Thompson v. Larson case that we cite in our brief. That case says there must be independent contributions to the intellectual property at issue. There are no such independent contributions here. And I didn't make this point, but I should now. When information would be given from PLS to Derrick, a suggestion might be made that they should include certain data points or information in the database, it wasn't rubber-stamped and included. It was Derrick who had to assimilate this information, analyze the information, reformat the information, represent it, et cetera. And so of the limited data points that were taken, and I think there was one instance in which Ms. Miracle suggested there were 439 deals that PLS recommended. Derrick accepted four. And when we look at the Larson case, it's an interesting case because it involves a dispute over the musical, the hit play Rent, if you will. And one of the alleged contributors, it was found that even a contribution of 9% or 10% to the musical score was deemed insufficient to establish a viable claim of ownership. And the court looked at this and basically said that any contributions that PLS may have made were essentially de minimis in nature. They weren't enough, whether it be 4 out of 439 deals, whether it be 0.2% out of 16,000 deals, to say these people stand on equal footing. To suggest otherwise would frankly be silly. And last but not least... Let me back up because I think I missed something. There were 439 deals put forward by whom? By PLS. Okay, PLS put them forward. And when you say deals, what you're talking about is raw material for the database. Correct. Okay. Corporate transactions. Right, transactions. And only four of them went into the database. That's right. And the record on appeal I can reference is 2578 to 2580 in that regard. I note my times out. I thank the court for your patience. And I would merely end by asking this court to respectfully affirm the decision of Judge Rosenthal because while we can all stand here today and second guess, that's not the role of the litigants or this court. There simply was no clear error that can be said to have been made by Judge Rosenthal. Thank you, Your Honor. Thank you, Mr. Cook. Oski. What I would like for you to do is just to summarize what the essence of the error that Judge Rosenthal made. Which issue? The ownership issue or the partnership issue or both? On both. I want you to capsulize it for me. Of course, Your Honor. First, I'll start with the ownership issue first. The error there was there's a contract that unambiguously provides that this database product they jointly developed and marketed was to be jointly owned. The district court erred as a matter of law in looking beyond the terms of that unambiguous contract to various other things. And I would like to point out, contrary to what Mr. Cook just told the court, at page 851 of the record, where the court in a single paragraph dealt with the conveyance issue separately from the partnership issue, it didn't say that the MOU doesn't address it, address whether or not it's to be jointly owned. It said two things about the MOU. It said the MOU did not comply with copyright . . . didn't address copyright ownership in a way that complied with 17 U.S.C. 204. Again, that was an issue that came up very late in the case, put in, and the district court in its subsequent order on January 15th backed off from that and didn't say, well, I'm just looking at 204 as kind of like . . . Can you come back to the question I initially asked? I apologize, Your Honor. Okay. So that's the error on the ownership issue. On the partnership issue, there's three key legal errors on three of the factors, and that's that the court understood control, how it interpreted the statute and Ingram incorrectly as to what control means. That legal error as to what control means led to it to influence and led it to not credit the findings that there was control. And that error alone requires reversal and remand on the partnership issue and, frankly, the ownership issue because if any of those factors be changed, that's a harmful error. It would go from two factors to three factors. That could well change the district court's determination. At a minimum, a remand is necessary. The second legal error is the misinterpretation of Ingram as to what constitutes the sharing of profits under Texas law. She imposed an overly stringent requirement on how profits must be calculated to meet that statute. The third legal error on the partnership issue was the district court, in its fact findings, talked about expressions of intent, which is what the statute says and what Ingram says is different than the common law test of actual intent. But then in the conclusions of the law, for whatever reason, the district court did not answer the question about expressions of intent. Instead, at page 850, she said there's limited evidence of intent to form, that switch in the question, which Ingram acknowledges is a material change in the law. That caused her to not give sufficient weight to the expressions of intent because at that point she's answering the wrong questions. So those are kind of my line-up of my four key legal errors. There's also some issues on the copyright issue as well. But what I'd like to turn to now is to respond to some of the points Mr. Cook made, if I could. First, PLS, as well as Mr. Wise and Mr. Lidsky, its witnesses, have been unequivocal and clear from 2009 to today that PLS has an ownership interest in this database, whether as a kind of a joint tenant in common or as a partner, that's true. The documents and emails that Mr. Cook referred to, these are the same kind of abridged versions of the documents and testimony that are in Appley's brief. If you look at pages 19 through 22 of our reply brief, you'll see the rest of the story. For example, the email where Mr. Wise says he didn't put ownership in there, he then goes on to say there's these other terms and that means joint ownership. So I would just point the court to pages 19 to 22 to see the rest of the story, and to see that Mr. Lidsky and Mr. Wise and PLS have consistently, from the beginning to today, said that they have an ownership interest in this database. Judge Elrod, you mentioned Record 4066, which is the email from Mr. Diodar to a third-party consultant about buying out PLS's interest. That email was in August 2012, nearly two years before this lawsuit was filed. So, I mean, yes, were there disputes between the parties in 2012, 2013? Yes, there were, but to the extent there's a suggestion that it's some part of settlement communication in this case, that's not the case at all. Also, regarding Thompson v. Larson, which is the copyright case in the Second Circuit that Mr. Cook mentioned, he left a part of Thompson v. Larson out, which is if the parties have a contract that shows an intent that whatever they create together is to be a joint work, then you don't need to show independent copyrightable contributions from both. Again, even in copyright, the contract controls, and our point here is the MOU shows that intent that the database to be jointly developed is, in fact, a jointly-owned product. Finally, there's a lot of talk about Nancy Miracle and how many lines were added to the database. At a certain level... I'm sorry, may I finish my sentence, Your Honor? That deals with the lines. Now, keep in mind, we don't dispute that Derek had keystroke control. They were the ones who decided... We gave them all the stuff that we had. They had a prior database that, over three years, they'd managed to sell to three customers, and then we had our database. We gave them access to it. They chose to only put a certain number of rows in. Okay, okay. Long sentence.